UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

United States of America,

        Plaintiff,

   vs.                REPORT AND RECOMMENDATION

Thomas Bernard Cloud, Jr.,

        Defendant.       Crim. No. 06-316 (JRT/RLE)

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

I.  <u>Introduction</u>

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the following Motions of the Defendant Thomas Bernard Cloud, Jr. ("Cloud"):

        1.    Cloud's Motion to Suppress Evidence Obtained as a Result of any Illegal Searches or Seizures.

        2.    Cloud's Motion to Suppress any Evidence Obtained as a Result of Any Illegal Interrogations.

A Hearing on the Motions was conducted on October 18, 2006, at which time, Cloud appeared personally, and by John C. Brink and Daniel L. Gerdts, Esqs.; and the

Government appeared by Erica H. MacDonald, Assistant United States Attorney.[1]  For

reasons which follow, we recommend that each of the Defendant's Motions be denied.

## II.  Factual Background

The Defendant is charged with one Count of possession of a firearm by a felon,

in violation of Title 18 U.S.C. §922(g)(1).  The alleged offense is said to have

occurred on or about March 21, 2006, in this State and District.  As pertinent to that

charge, and to the Motions now before us, the operative facts may be briefly

summarized.[2]

---

[1]At the close of the Hearing, the parties requested leave to submit post-Hearing memoranda on the legal issues raised by the Defendant's Motions.  Leave was granted, and the last submission on the issues was received on November 9, 2006, at which time, the Motions were taken under advisement.  See, Title 18 U.S.C. §3161(h)(1)(F) and (J); Henderson v. United States, 476 U.S. 321, 330-32 (1986); United States v. Blankenship, 67 F.3d 673, 676-77 (8th Cir. 1995).

[2]Rule 12(d), Federal Rules of Criminal Procedure, provides that "[w]hen factual issues are involved in deciding a motion, the court must state its essential findings on the record."  As augmented by our recitation of factual findings in our "Discussion," the essential factual findings, that are required by the Recommendations we make, are contained in this segment of our Opinion.  Of course, these factual findings are preliminary in nature, are confined solely to the Motions before the Court, and are subject to such future modification as the subsequent development of the facts and law may require.  See, United States v. Moore, 936 F.2d 287, 288-89 (6th Cir. 1991); United States v. Prieto-Villa, 910 F.2d 601, 610 (9th Cir. 1990).

At the Hearing, Robert LeClair ("LeClair"), who is a Deputy with the Itasca County Sheriff's Office, testified at the instance of the Government.   According to LeClair, on March 21, 2006, at approximately 10:00 o'clock p.m., he was patrolling the area near Deer River, Minnesota, when he observed a grey four-door Cadillac vehicle pull out of a gas station, and begin traveling northbound on Minnesota State Highway 46.   The vehicle did not appear to have a rear license plate and, from the officer's vantage point, no temporary vehicle registration sticker was visible.   LeClair, who was driving a marked squad car, followed the vehicle after it had pulled onto Highway 46 for approximately two (2) miles.   LeClair observed the vehicle cross  the center line separating oncoming traffic on two (2) or three (3) occasions.

Thereafter, he observed the vehicle pass over the fog line, and onto the shoulder of the Highway, on several other occasions.   Minnesota law requires the display of both front and rear license plates, see, Minnesota Statutes Section 169.79, Subdivision 6, or, where a vehicle is newly purchased, the display of a temporary registration sticker, which must be posted on the left side of the inside rear window of the vehicle. See, Minnesota Statutes Section 168.092, Subdivision 1.   In addition, vehicles are prohibited from crossing the center line, which divides the lanes from oncoming traffic, see, Minnesota Statutes Section 169.18, Subdivision 1, or from crossing the

fog line on the shoulder of the roadway.   See, <u>Minnesota Statutes Section 169,</u>

<u>Subdivision 7(a)</u>; see also, <u>State v. Richardson</u>, 622 N.W.2d 823, 825-26 (Minn.

2001).

At the Hearing, LeClair testified that:

> The vehicle was what I would consider weaving within its
> lane.  It wasn't keeping a straight course of travel.  It was
> going from the fog line to centerline and then it had crossed
> over them several times, like I said.

[T. 14].

Based upon his observations, LeClair decided to initiate a traffic stop of the Cadillac.

LeClair activated the emergency lights of his marked patrol car, and the driver of the

Cadillac pulled over, and stopped the vehicle on the shoulder of the road, while a

portion of the vehicle remained in the traffic lane.

LeClair approached the driver side of the vehicle on foot, and observed a yellow

21-day license tag affixed to the back window.   He then shined his flashlight upon the

driver, as well as the vehicle's other occupants,  and asked her for a  driver's license

and insurance information.  None of the vehicle's occupants -- a female driver, a male

passenger in the front passenger seat, and a female passenger seated behind the male

passenger -- were wearing seatbelts.  At the Hearing, LeClair testified that he had not

observed any activity prior to his approach, which he would attribute to the passengers' removal of any seatbelts.

Upon inquiry, the driver did not produce a driver's license, and provided only her name and date of birth. She also stated that she had just purchased the vehicle in Moorhead, Minnesota. LeClair observed that, during his conversation with the driver, the male passenger stared straight ahead, and fumbled with his hands. LeClair testified that, based on his training and experience in conducting traffic stops, he found the male passenger's behavior "odd," in that he refused to make eye contact with LeClair, and he also appeared "very nervous." Id. at 19-20. LeClair asked both passengers for a driver's license, but each of them only provided a name and date of birth. LeClair testified that, based upon his training and experience, he did not detect any sign of intoxication on the part of the driver. Despite the presence of the temporary permit, LeClair believed he needed to continue his investigation so as to assure that the vehicle had not been stolen, based on the behavior of the occupants.

LeClair walked back to his marked squad car, contacted his dispatcher, and submitted the names and dates of birth which were provided by the car's occupants. The dispatcher informed LeClair that the driver possessed a valid license, and that the

female passenger had no active Warrants issued for her arrest.  A search for the name and date of birth given by the male passenger returned no such person on file.

LeClair testified that he believed that the male passenger appeared to be between 25 and 27 years of age, and accordingly, that the passenger's identity should be on file.  On that basis, LeClair asked, without the display of a weapon, for the male passenger to accompany him back to the squad car, and speak with him in private to discuss the spelling of his name.  LeClair then asked the passenger to spell his name, at which time, the passenger responded that his name was "Kristopher Leigh Fisher," which included a different spelling than LeClair had previously radioed to the dispatcher.  During the exchange, which was held in front of LeClair's squad car -- in an area illuminated by the car's headlights -- LeClair observed that the male passenger was extremely nervous, and that his arms and legs were shaking.

At that point, the dispatcher informed LeClair, within the Defendant's earshot, that there were two (2) active Arrest Warrants, issued by Beltrami County, for "Kristopher Fisher" with the same date of birth that the Defendant had provided.  The dispatcher told LeClair that a posting of $630.00 bail would satisfy the terms of the Warrants, such that the passenger would be free to go.

LeClair asked the male passenger whether he had $630.00 in his possession, and the Defendant told him that he could retrieve that amount of money if they traveled to the Defendant's home.  LeClair told the male passenger that he would be free to go after posting the bail, and that he would take him to his residence to obtain the money.  LeClair handcuffed the male passenger, who is the Defendant, and placed him in the back of the squad car.

LeClair then approached the Cadillac from the passenger side in order to inform the vehicle's occupants of his intention to transport the passenger back to his residence to secure the bail money.  LeClair opened the door, and the vehicle's dome light switched on.  At that point, he observed, in plain view, the handle of a firearm lying on the floor of the passenger side.  He testified that the gun was partially obstructed by the passenger seat, but that he would have been able to see the gun in plain view from the street if he had looked into the car with his flashlight. The driver attempted to close the vehicle's door.  LeClair kept the door open in order to secure the gun, which he did by grabbing it with his left hand.  He proceeded to remove the vehicle's occupants and place them in handcuffs, in the interests of officer safety. LeClair testified that he believed it was a violation for the firearm to be transported in an occupied vehicle when it was loaded and uncased.

CASE 0:06-cr-00316-JRT-RLE   Document 28   Filed 11/17/06   Page 8 of 49

LeClair recounted his observations in a radio call to his dispatcher, and law enforcement were dispatched to the scene. LeClair then asked the vehicle's occupants whether the firearm belonged to any of them, to which they replied that they had no knowledge of the firearm. LeClair's partner arrived at the scene and took the statements of the vehicle's occupants, and the male passenger was transported to the County Jail. LeClair testified that approximately thirty (30) minutes had passed between his stop of the car, and his departure from the scene, and that ten (10) minutes had elapsed between the initiation of the traffic stop, and the time he learned of the Warrants.

Upon his arrival at the Itasca County Jail, LeClair secured his gun in storage, and escorted the male passenger into the jail, pursuant to the Warrants. The male passenger again identified himself as "Kristopher Fisher" at the booking, and was subsequently escorted to an interview room. It was later determined, after the male passenger was booked, that the Defendant's true identity was Thomas Bernard Cloud, and that he had given a false identity to LeClair.

The Defendant arrived in the interview room while wearing handcuffs, and was seated at a chair in front of a desk. The only door to the room was shut. LeClair removed the Defendant's handcuffs and he was seated. No weapons were present at

- 8 -

any time during the course of the interview.  LeClair testified that the entirety of the interview was recorded, and the Government has provided a transcript of that interview, as well as an audio recording, both of which were received into evidence. See, Government Exhs. 1 and 2.  The interview lasted for approximately ten (10) minutes, and LeClair testified that the Defendant never asked for an attorney nor invoked his right to remain silent.  LeClair further testified that the Defendant appeared intelligent, responsive, and that no threats or promises were made through the entirety of their exchange.  At the beginning of the interview, LeClair advised the Defendant of his rights,  see, Miranda v. Arizona, 384 U.S. 436 (1966).  At which time, the following exchange occurred:

> LeClair:     Okay, I'm gonna read it to you, alright?  You have the right to remain silent, anything you say can and will be used against you in a court of law.  You have the right to talk with a lawyer and have him present with you while you're being questioned, and if you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish.  Um, having these rights in mind, do you wish to speak with me about tonight?
>
> Defendant:   What about tonight?
>
> LeClair:     What's that?
>
> Defendant:   What about tonight?

LeClair:     Well that's we got to get down to the business here.  But I need to know if you're ah -- willing to talk to me or not?

Defendant:   (Pause)

LeClair:     Discuss what happened tonight.

Defendant:   What's to discuss?

LeClair:     What's that?

Defendant:   What's to discuss?

LeClair:     Do you want to talk about it or not?

Defendant:   Well what'd you want to talk about it for?

LeClair:     What's that?

Defendant:   What do you want to talk about it for?

LeClair:     Well that's the reason you're here.

Defendant:   No, you said I'm here cuz of that warrant.

LeClair:     And issues with the vehicle, but I got to get straight that you are willin' to talk to me.

Defendant:   Still ain't gonna change the fact that you said you were gonna take me to get my money, now I'm stuck in Grand Rapids.

LeClair:     Do you want to talk about that or do you want me just to book you into jail?

- 10 -

Defendant:   I want to be able to get my money so I can get out.

LeClair:       So do you want to talk about tonight?

Defendant:   Well, first of all you got to keep your end of the deal.  You said you're gonna take me to get that money.

LeClair:       Okay.  We had other issues come up though.

Defendant:   Yeah, but you already gave me your word that you would.

LeClair:       What's that?

Defendant:   You already told me you would give -- take me to get that money.

LeClair:       First of all before we get any farther, I need a yes or no answer from you?

Defendant:   I need to know why you didn't take me to get that money like you said you were gonna.

LeClair:       We'll get into that.  Do you want to talk about it, lets talk about it.

Defendant:   There's nothin' to talk about.

LeClair:       What's that?

Defendant:   There's nothin' to talk about.  You kept your -- you didn't keep your end of the deal, so why should I talk to you about anything.

LeClair:       Don't you want to know what's goin' on?

- 11 -

Defendant:   There is nothing goin' on, so I don't need to know nothin'.  Alls I know is I got the money at home. You said you're gonna take me to get it, now you won't. Now you brought me all the way over here.

LeClair:        Okay.

Defendant:   And you didn't bring nobody else.  And you even told me you were gonna take me to get the money.

LeClair:        Do you want me to explain that to you, why that happened?

Defendant:   You said cuz of the warrant.

LeClair:        Okay.  Do you want me to explain what's goin' on here Kris?

Defendant:   I wish you would.

LeClair:        Okay.  Are you willin' to talk with me, you got to answer --

Defendant:   Well, no, you said you were gonna explain something.

LeClair:        I'm gonna explain it, but I need to know that you're gonna listen and you're gonna be cooperative with me.

Defendant:   Well there ain't nothin' to talk about cuz I don't know nothin'.

LeClair:        What do you mean you don't know nothin'?

Defendant:   Whatever you're tryin' to -- whatever you're tryin' -- whatever issues you're tryin' bring me here for.  I don't know shit about it, cuz I don't even still understand why I'm here.  You said you're gonna take me to get my money and that was it.

LeClair:      Okay.   Do you swish to speak with an attorney?

Defendant:  Yeah.  Probably.  Cuz you ain't explaining nothing'.

LeClair:      Do you want - do you want to talk to an attorney, or do you want me to explain things or -- or don't you want to talk.  You know.  I got to know before I get into detail here if you're willing ah -- talk to me or not.  That's what I need to know.

Defendant:   No, I just want to get my money and leave.

LeClair:      Well that's not gonna happen right now.  And we need to talk about why that's not gonna happen.

Defendant:  Well why?  Tell me.

LeClair:      Well here's the deal.  Were you in a silver car tonight?

Defendant:   Tell me why I can't leave tonight?

LeClair:      We're gonna get into that right now.

Government Exh. 2, at pp. 1-4.

- 13 -

LeClair proceeded to interview the Defendant about the events that had taken place during that evening.  The following exchange also took place during the course of the interview:

> Defendant:   Can you tell me exactly why I can't leave tonight.
>
> LeClair:      I'm gettin' there.  You got to patient with me though.
>
> Defendant:   Them questions don't have nothin' to do with why I can't leave.
>
> LeClair:      Oh, it has -- has ever -- has everything to do with why you can't leave.
>
> Defendant:   Well then tell me why. Then if you tell me exactly why I can't leave tonight, then I'll tell you, answer your questions.   But I'm not answerin' no questions [til] you tell me that.
>
> LeClair:      You can't leave right now because you're being charged with another crime.
>
> Defendant:   What?
>
> LeClair:      Possession of a handgun.
>
> Defendant:   I didn't have no handgun.

Id. at p. 5.

LeClair and the Defendant continued to discuss the events that had transpired during the evening, and the Defendant repeatedly denied any knowledge or possession of the handgun.  The interview was eventually terminated.

LeClair testified that two (2) days after the Defendant's arrest, he learned of the Defendant's true identity, from the fingerprints obtained at the Defendant's booking. He also testified that the Defendant had thirteen (13) previous felony convictions.

## III.  Discussion

A.    The Defendant's Motion to Suppress Evidence Obtained as a Result of any Illegal Searches or Seizures.

The Defendant's Motion is predicated on his contention that there was no reasonable suspicion to justify the continued inquiry into the Defendant's identity, after LeClair had determined, over the course of the traffic stop, that the driver was free of any Warrants, and was licensed to drive in Minnesota.  See, Defendant's Memorandum of Law in Support of Suppression of Evidence, Docket No. 26, at p. 4. Since our determination of the lawfulness of the traffic stop, and the lawfulness of the subsequent inquiry into the Defendant's identity, involve different considerations, each will be addressed separately.

     1.     <u>The Traffic Stop</u>.

         a.     <u>Standard of Review</u>.  The Fourth Amendment provides that "the right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  <u>United States Constitution, Amendment IV</u>.  A roadside traffic stop "is well established" as a "'seizure' within the meaning of the Fourth Amendment."  <u>United States v. Jones</u>, 269 F.3d 919, 924 (8th Cir. 2001), quoting <u>Delaware v. Prouse</u>, 440 U.S. 648, 653 (1979); see also, <u>United States v. Martinez-Fuerte</u>, 428 U.S. 543, 556-558 (1976); <u>United States v. Brignoni-Ponce</u>, 422 U.S. 873, 878 (1975).  An essential purpose behind the Fourth Amendment's proscriptions is to impose standards of reasonableness upon the exercise of law enforcement's discretionary powers, so as to safeguard an individual's privacy from arbitrary invasion by the Government.  See, <u>Delaware v. Prouse</u>, supra at 653-54; <u>Marshall v. Barlow's Inc.</u>, 436 U.S. 307, 312 (1978); <u>Camara v. Municipal Court</u>, 387 U.S. 523, 528 (1967).  As a result, whether a certain action is permissible, under the Fourth Amendment, "is judged by balancing [that action's] intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests."  See, <u>Delaware v. Prouse</u>, supra at 654.

In considering the extent to which a traffic stop intrudes upon an individual's Fourth Amendment interests, the Supreme Court has held that traffic stops are investigative detentions, not custodial detentions, and therefore, the principles of Terry v. Ohio, 392 U.S. 1 (1968), govern the analysis as to the reasonableness of the stop. See, United States v. Jones, supra at 925, citing Berkemer v. McCarty, 468 U.S. 420, 439 (1984); see also, Delaware v. Prouse, supra at 663. The Supreme Court has instructed that, prior to making a traffic stop, law enforcement must have "probable cause to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations -- or other articulable basis amounting to reasonable suspicion that the driver is unlicensed or his vehicle unregistered." Delaware v. Prouse, at 661.

However, "[i]t is well established that a traffic violation -- however minor -- creates probable cause to stop the driver of a vehicle." United States v. Fuse, 391 F.3d 924, 927 (8th Cir. 2004), quoting United States v. Barry, 98 F.3d 373, 376 (8th Cir. 1996), quoting, in turn, United States v. Barahona, 990 F.2d 412, 416 (8th Cir. 1993). Accordingly, "a police officer who personally observes a traffic violation has probable cause to stop the vehicle and offending driver." United States v. $404,905.00 in U.S.

- 17 -

Currency, 182 F.3d 643, 646 (8th Cir. 1999), citing Pennsylvania v. Mimms, 434 U.S. 106, 109 (1977).

"This is true even if a valid traffic stop is a pretext for other investigation." United States v. Linkous, 285 F.3d 716, 719 (8th Cir. 2002), citing Whren v. United States, 517 U.S. 806, 812-13 (1996).  Simply put, "an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause * * * [t]hat is to say, his subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause."  Devenpeck v. Alford, 543 U.S. 146, 153 (2004).  As the Supreme Court has repeatedly explained, "'the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.'"  Id., quoting Whren v. United States, supra at 815; see also, United States v. Pereira-Munoz, 59 F.3d 788, 791 (8th Cir. 1995)("So long as the officer is doing nothing more than he is legally permitted and objectively authorized to do, his actual state of mind is irrelevant.").

Moreover, there is no requirement that there be a traffic violation, so long as the police officer has a reasonable suspicion that the vehicle, or its occupants, are

involved in criminal activity.  See, <u>United States v. Mora-Higuera</u>, 269 F.3d 905, 909 (8th Cir. 2001), citing <u>Alabama v. White</u>, 496 U.S. 325 (1990).  "Reasonable suspicion requires "'a particularized and objective basis" for suspecting the person stopped of criminal activity,'" which is not as demanding a standard as a showing of probable cause.  <u>Thomas v. Dickel</u>, 213 F.3d 1023, 1025 (8th Cir. 2000), quoting <u>Ornelas v. United States</u>, 517 U.S. 690 (1996), quoting, in turn, <u>United States v. Cortez</u>, 449 U.S. 411, 417 (1981); and citing, <u>United States v. Sokolow</u>, 490 U.S. 1 (1989).

      b.   <u>Legal Analysis</u>.  Here, LeClair effected a traffic stop of the vehicle, in which the Defendant was a passenger, after he observed that no license plate was displayed on the rear of the vehicle and, from the officer's vantage point, that a temporary registration sticker was not visible in the left rear window of the vehicle. Since the absence of such displays of registration constitutes a violation of Minnesota law, see, <u>Minnesota Statutes Sections 169.79, Subdivision 6, and 168.092, Subdivision 1</u>, LeClair was fully justified in effecting the traffic stop of the Cadillac. See, <u>United States v. Bueno</u>, 443 F.3d 1017, 1024-25 (8th Cir. 2006)(traffic stop was supported by reasonable suspicion where the stopped vehicle did not have a front licence plate, the officers did not see the temporary registration sticker until after the stop, and the lack of license plates or a temporary registration would have constituted

a violation of State law);United States v. Peltier, 217 F.3d 608, 610 (8th Cir. 2000)
(probable cause present when traffic stop prompted when defendant's vehicle had no
registration plates, and the dark tint of the rear window prevented law enforcement
from seeing the temporary registration application), citing United States v. Dexter,
165 F..3d 1120, 1123-26 (7th Cir. 1999)(same); United States v. Gaxiola, 149 Fed.
Appx. 560, 561-62 (8th Cir., October 5, 2005)(failure to display front license plates
justified traffic stop).   In addition, LeClair had observed the vehicle cross over the
fogline, as well as the centerline of the road, on several occasions and, as such, the
driver's conduct was in violation of Minnesota Statutes Section 169.18.   For that
additional reason, LeClair was justified in effecting a traffic stop of the Cadillac.   See,
United States v. Fuse, supra at  927.

Since the traffic stop was lawful, LeClair was entitled to conduct a reasonable
investigation into the unlawful activity that justified the stop.    "A reasonable
investigation includes asking for the driver's license, registration, as well as inquiring
about the occupants' destination, route, and purpose."   United States v. Sanchez, 417
F.3d 971, 975 (8th Cir. 2005), quoting United States v. Munroe, 143 F.3d 1113, 1116
(1998); see also, United States v. Slater, 411 F.3d 1003, 1005 (8th Cir. 2005)("We
have held repeatedly that mere police questioning does not constitute a seizure," and

that "[e]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; [and] ask to examine the individual's identification."); <u>United States v. Gaxiola</u>, supra at 561.  Therefore, LeClair was also justified in requesting to see the driver's license of the driver of the vehicle.

Since the driver was unable to produce a valid driver's license, or any other form of identification, LeClair's inquiry as to whether the Defendant was a licensed driver was also permissible, since the inquiry was prompted by LeClair's need to determine whether the driver's operation of the vehicle was unlawful, or whether either of the vehicle's occupants were authorized to operate a motor vehicle.  See, <u>Minnesota Statutes Section 171.02, Subdivision 1</u> ("Except when expressly exempted, a person shall not drive a motor vehicle upon a street or highway in this state unless the person has a license valid under this chapter for the type or class of vehicle being driven.").  Therefore, we find no constitutional infirmity in any of LeClair's conduct that preceded the Defendant's exit from the vehicle.

2.      <u>LeClair's Continued Inquiry into the Defendant's Identity</u>.

Once stopped, an officer may then conduct a "reasonable investigation," which includes "asking for the driver's license and registration, requesting that the driver sit in the patrol car, and asking the driver about his destination and purpose,"

- 21 -

and he "may engage in similar routine questioning of the vehicles passengers to verify information provided by the driver." United States v. Johnson, 58 F.3d 356, 357 (8th Cir. 1995)[internal citations omitted]; see also, United States v. Sanchez, 417 F.3d 971, 974-75 (8th Cir. 2005); United States v. Williams, 431 F.3d 296,  298 (8th Cir. 2005).

The questioning is limited, however, to the circumstances that justified the stop. See, United States v. Tillmon, 64 F.3d 1120, 1124 (8th Cir. 1995), citing United States v. Cummins, 920 F.2d 498, 501 (8th Cir. 1990).   Of course, once LeClair's "observations aroused reasonable suspicions, he was entitled to expand the scope of the stop and ask questions not directly related to the initial traffic stop."  United States v. Gomez Serena, 368 F.3d 1037, 1040 (8th Cir. 2004); see also, United States v. Allegree, 175 F.3d 648, 650 (8th Cir. 1999), cert. denied, 528 U.S. 958 (1999).  Any "consent given in the course of such questioning is valid so long as it is voluntary." United States v. Allegree, supra at 650, citing United States v. Pereira-Munoz, 59 F.3d 788, 791 (8th Cir. 1995).  In addition, incident to the traffic stop, an officer may also request that the driver and/or the passenger step out of the vehicle.  See, United States v. Beatty, 170 F.3d 811, 812 (8th Cir. 1999); see also, Maryland v. Wilson, 519 U.S.

408, 415 (1997)("We * * * hold that an officer making a traffic stop may order passengers to get out of the car pending completion of the stop.").

        As we have previously noted, LeClair's initial questioning of the Defendant was clearly appropriate, as he simply asked him for identification, and then performed a check for any outstanding Warrants, as well as determining the driver's license status of each of the vehicle's occupants.  See, e.g., United States v. White, 81 F.3d 775, 778 (8th Cir. 1996)("A law enforcement officer may also run a computer check to establish whether the vehicle has been stolen and to ascertain whether there are outstanding arrest warrants for the occupants of the car."); United States v. Morris, 910 F. Supp. 1428, 1441 (N.D. Iowa 1995)("A detention following a vehicle stop does not exceed its reasonable scope while the law enforcement officer who made the stop makes an initial request for identification from the driver and any passengers, asks for an explanation of the presence of the occupants of the vehicle in the area, their destination and purpose, and runs a warrant check on the drivers licenses of all occupants of the vehicle, and a check on the registration of the vehicle to see if it is stolen or otherwise not in order.").

        We conclude that LeClair had reasonable suspicion to believe that the Defendant had violated State law, as he testified that he did not observe the

Defendant, who was in the front-side passenger seat, to be wearing a seat-belt.  See, Minnesota Statutes Section 169.686.  LeClair further testified that he did not observe any movement during his approach to the vehicle, which led him to believe that the Defendant had removed his seat-belt once the vehicle had come to a stop.  On that basis alone, LeClair was justified in verifying the Defendant's identity, as well as in determining if there were any outstanding Warrants for his arrest.

Moreover, LeClair testified that the Defendant acted "oddly" by  refusing to make eye contact with him, and that he was visibly shaking during the time in which LeClair addressed him.  According to LeClair, the fact that the name given by the Defendant did not match any name on file led LeClair to believe that he had been provided with either a false name, or that there was a discrepancy in the spelling of the name.  [T. 21].  Under the totality of the circumstances,  LeClair had developed justifiable suspicions that the Defendant had provided a false name, which is a violation of Minnesota Statutes Section 609.506, and LeClair was justified in asking the Defendant to clarify whether LeClair had originally misspelled the name that the Defendant had provided.

The uncontroverted testimony of LeClair establishes that the Defendant voluntarily consented to exit the car, and that he provided a name, and date of birth,

for identification purposes.  Our Court of Appeals has recently reiterated that "[a] request to see identification is not a seizure, 'as long as the police do not convey a message that compliance with their request [] is required.'"  United States v. Vera, 457 F.3d 831, 835 (8th Cir. 2006), citing Florida v. Bostick, 501 U.S. 429, 435 (1991),  and United States v. Slater, supra at 1006. The Court further clarified that, in the context of a request to exit a vehicle and provide some form of identification, "[a]n authoritative order or command to exit a vehicle effects a seizure," while "a request -- with its implication that the request may be refused -- gives 'no indication' that consent is required."  Id., comparing United States v. Slater, supra at 1005, with United States v. Drayton, 536 U.S. 194, 200 (2002).

LeClair testified that he  asked the Defendant to step out of the vehicle, and to speak with LeClair privately, in order to ensure that the spelling of the name that LeClair submitted to the dispatcher was correct.  In United States v. Vera, supra at 836, our Court of Appeals noted that, "absent a factual finding that [law enforcement] did more than request [the passenger] to exit his vehicle, provide his identification, and enter the patrol car, there is no basis to conclude that the encounter was anything other than consensual," when the record contained "no other indicia of coercion."  Id. at 836.  We find the circumstances presented here are closely analogous to those in

- 25 -

<u>Vera</u>, in that LeClair merely asked the Defendant whether he would exit the vehicle, and speak with him in private, to ensure that he had submitted the correct spelling of the Defendant's name to the dispatcher.  No weapons were drawn, and the Defendant has not provided any evidence which would suggest that LeClair's request could be construed as a command.  Furthermore, the only request made of the Defendant was for a spelling of his name.   Under the totality of the circumstances, there is no evidence to suggest that the Defendant was threatened, or was compelled, to provide any further information to LeClair.   Therefore, based on the totality of the circumstances, we find that the Defendant voluntarily submitted to providing the spelling of his previously proffered identity.[3]

The Defendant argues that LeClair did not have any justification to reasonably suspect the Defendant of any criminal wrongdoing, and that, under <u>United States v. Beck</u>, 140 F.3d 1129, 1136 (8th Cir. 1998), the Defendant's nervous appearance was

---

[3]We note that, on the Record before us, that the Defendant did not dispute there were two (2) valid arrest Warrants for the person identified by the name, and date of birth, which were provided by the Defendant to LeClair.  In fact, at the time he was informed of the existence of the Warrants, the Defendant represented to LeClair that they likely resulted from a past altercation in Bemidji, Minnesota.  [T. 25].  Although not expressly addressed by the Defendant, we find that LeClair had probable cause to arrest the Defendant, based on the identity provided by the Defendant, and the dispatcher's advisory that two arrest Warrants were issued for "Kristopher Fisher."

not sufficient to justify LeClair's further inquiry.  However, we find <u>Beck</u> inapposite, as there, our Court of Appeals found that, under the totality of the circumstances, which included law enforcement's observation that the defendant had a "nervous demeanor," it was "impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation."    <u>Id.</u> at 1137, quoting <u>United States v. Wood</u>, 106 F.3d 942, 948 (10th Cir. 1997), quoting in turn <u>Karnes v. Skrutski</u>, 62 F.3d 485, 496 (3rd Cir. 1995). Here, in contrast, LeClair articulated objective bases for his reasonable suspicion in believing that the Defendant had violated the applicable Minnesota seatbelt law, based upon his personal observations, and for his suspicion that the Defendant had provided a false identity, given the absence of the name and date of birth, which had been provided by the Defendant, in the pertinent driving and police records.  Either of those beliefs, whether in combination, or alone, are particular enough to satisfy us that LeClair had reasonable suspicion to ask the Defendant to verify the spelling of his name, especially when coupled with the Defendant's "odd" and nervous behavior.[4]

---

[4]The act of asking one to provide a spelling of his or her name, which had already previously been provided, is a most minimal of intrusions and, to hold otherwise would serve no purpose other than penalize law enforcement for an inability to guess the accurate spelling of a given name.

In sum, since we find that the traffic stop was supported by reasonable suspicion of a traffic violation, and that LeClair's further efforts to identify the Defendant were based upon a reasonable suspicion that the Defendant had violated applicable State law -- we conclude that LeClair committed no Fourth Amendment violation in effecting the traffic stop of the vehicle in question, in asking the Defendant to exit the vehicle and confirm the spelling of the name he had previously provided, and in arresting the Defendant pursuant to the Arrest Warrants. Accordingly, we recommend that the Defendant's Motion to Suppress Evidence Obtained from any Searches or Seizures on those bases be denied.

On this Record, it is unclear whether the Defendant is also challenging the recovery of the firearm from the vehicle in which he was traveling. He does not mention any basis for the suppression of the firearm in his post-Hearing briefing, and he does not address whether he seeks the suppression of the firearm, which was recovered from the Cadillac. As noted by the Government, the Defendant has not made any claim of a privacy interest in the car in which he was traveling, or any ownership interest in the firearm.

As an initial matter, we harbor considerable doubt as to whether the Defendant has "standing" to challenge the search of a vehicle in which he was a passenger. See,

United States v. Barragan, 379 F.3d 524, 530 (8th Cir. 2004).  We need not reach that

issue, however, since we find that the search of the vehicle was permissible, as a

search incident to a lawful arrest.  "Searches without a warrant are per se unreasonable

subject to a few well established exceptions."  United States v. Hill, 386 F.3d 855, 858

(8th Cir. 2004).  One exception is a search incident to a valid arrest.  See, e.g., New

York v. Belton, 453 U.S. 454, 461 (1981); Chimel v. California, 395 U.S. 752, 762

(1969); United States v. Klein, 13 F.3d 1182, 1184 (8th Cir. 1994), cert. denied, 512

U.S. 1226 (1994).  As our Court of Appeals has explained:

> The authority to search the person incident to a lawful
> custodial arrest, while based upon the need to disarm and to
> discover evidence, does not depend on what a court may
> later decide was the probability in a particular arrest
> situation that weapons or evidence would in fact be found
> upon the person of the suspect.

Conrod v. Davis, 120 F.3d 92, 96 (8th Cir. 1997), cert. denied, 523 U.S. 1081 (1998),
citing United States v. Robinson, 414 U.S. 218, 235 (1973).

"A custodial arrest of a suspect based on probable cause is a reasonable intrusion

under the Fourth Amendment; that intrusion being lawful, a search incident to the

arrest requires no additional justification."  Id.; see also, Curd v. City Court of

Judsonia, Arkansas, 141 F.3d 839, 842 (8th Cir. 1998)("Warrantless searches incident

to a custodial arrest are 'justified by the reasonableness of searching for weapons,

instruments of escape, and evidence of crime when a person is taken into official

custody and lawfully detained.'"), quoting United States v. Edwards, 415 U.S. 800, 802-03 (1974).

A search incident to arrest may include all areas within the immediate control of the person, including the passenger compartment of an automobile occupied by an arrestee at the time of his arrest. See, New York v. Belton, supra at 460. The scope of a permissible vehicle search extends to all containers within the passenger compartment of the automobile, including "glove compartments, consoles, and other receptacles located anywhere within the passenger compartment, as well as luggage, boxes, bags, and the like." Id. at 1261, n. 4; accord, United States v. McCready, 774 F.2d 868, 871-872 (8th Cir. 1985)(glove compartment); see also, United States v. Pogemiller, 375 F.3d 686, 688 (8th Cir. 2004)(trap door which leads to an area connecting the trunk of the vehicle to the vehicle's back seat); United States v. Caldwell, 97 F.3d 1063, 1067 (8th Cir. 1996)(hatchback area); United States v. Veras, 51 F.3d 1365, 1372 (7th Cir. 1995)(secret compartments located within the back seat). Further, an officer need not have had contact with an arrestee prior to his exit from the vehicle, so long the search of the automobile is contemporaneous with the arrest. United States v. Pogemiller, supra at 687, citing Thornton v. United States, 541 U.S. 615 (2004).

Here, the search of the vehicle was contemporaneous with the Defendant's arrest, and there has been no suggestion, let alone a showing, that LeClair's search included areas that were outside of the passenger compartment of the vehicle. To the contrary, LeClair's uncontradicted testimony reflects that incriminating evidence was discovered in the area near the place where the Defendant had been seated, in plain view of LeClair as he returned to inform the vehicle's occupants of his intention to transport the Defendant to his residence to pick up the $630.00. The fact that LeClair may have uninvitedly opened the door of the Cadillac, in order to tell the occupants that the Defendant would be traveling with him, is of no moment, as LeClair testified that the firearm would have been in plain view had LeClair shown his flashlight through the window of the vehicle, and LeClair was authorized, by the Defendant's arrest, to search the portion of the vehicle's interior where the firearm was observed. Accordingly, we recommend that LeClair's Motion to Suppress be denied, as it pertains to his arrest, and to the search of the vehicle that was conducted incident to his arrest.

   3.   <u>Suppression of the Defendant's Fingerprints and DNA Swab.</u>

   The Fourth Amendment requires that "a search warrant must be issued by a neutral and detached magistrate," <u>Technical Ordnance Inc. v. United States</u>, 244

F.3d 641,  647 (8th Cir. 2001), citing <u>Johnson v. United States</u>, 333 U.S. 10, 13-14 (1948), who will "assess the underlying factual circumstances so as to ascertain whether probable cause exists to conduct a search or to seize incriminating evidence, the instrumentalities or fruits of a crime, or contraband." <u>United States v. Winningham</u>, 953 F. Supp. 1068, 1077 (D. Minn. 1996), citing <u>Warden v. Hayden</u>, 387 U.S. 294 (1967); <u>United States v. Johnson</u>, 64 F.3d 1120, 1126 (8th Cir. 1995). A finding of probable cause must be based upon a consideration of all of the circumstances set forth in the supporting Affidavit, and is proper when a "'fair probability [exists] that * * * evidence of a crime will be found in a particular place,'" or when "'a substantial basis [exists] for * * * conclud[ing]' that a search would uncover evidence of wrongdoing." <u>United States v. Horn</u>, 187 F.3d 781, 785 (8th Cir. 1999), quoting <u>Illinois v. Gates</u>, 462 U.S. 213, 236, 238 (1983), quoting, in turn, <u>Jones v. United States</u>, 362 U.S. 257, 271 (1960); see also, <u>United States v. Gladney</u>, 48 F.3d 309, 313 (8th Cir. 1995); <u>United States v. Tagbering</u>, 985 F.2d 946, 949 (8th Cir. 1993).

Probable cause is "a fluid concept -- turning on the assessment of probabilities in particular factual contexts" and, as such, is "not readily, or even usefully, reduced to a neat set of legal rules." <u>Illinois v. Gates</u>, supra at 232; see also, <u>Cooper Industries,</u>

Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 435 (2001); Ornelas v. United States, 517 U.S. 690, 697 (1996).  In considering the issuance of a Search Warrant, probable cause must be viewed under a reasonableness standard, "the touchstone of the Fourth Amendment," which "is measured in objective terms by examining the totality of the circumstances."   Ohio v. Robinette, 519 U.S. 33, 39 (1996), quoting Florida v. Jimeno, 500 U.S. 248, 250 (1991).

Search Warrant "[a]pplications and affidavits should be read with common sense and not in a grudging, hyper technical fashion." Walden v. Carmack, 156 F.3d 861, 870 (8th Cir. 1998); United States v. Williams, 10 F.3d 590, 593 (8th Cir. 1993). "In conducting such an examination, the Court should review the affidavits as a whole, and not on a paragraph-by-paragraph basis."   United States v. Winningham, supra at 1077, citing United States v. Anderson, 933 F.2d 612, 614 (8th Cir. 1991); United States v. Townsley, 843 F.2d 1070, 1076-77 (8th Cir. 1988).  Under the Fourth Amendment's preference for searches conducted pursuant to Warrants, see, Illinois v. Gates, supra at 236, Courts reviewing Search Warrants are to "accord great deference to the decision of the Judicial Officer who issued the Warrant," and must not engage in a de novo review.   United States v. Maxim, 55 F.3d 394, 397 (8th Cir. 1995); see also, Walden v. Carmack, supra at 870.

Here, given the averments provided in the Affidavit of Mike Bliss, who is an investigator with the Itasca County Sheriff's Department, in support of the issuance of Search Warrants, there is unquestionably probable cause for the search of the Defendant's person for biological samples, and for his fingerprints. See, Government Exh. 3. Here, Bliss recounted the events leading up to the Defendant's arrest, and noted that LeClair had arrested the Defendant after learning that there were two Warrants for the person whose identity matched the identifying information that had been provided by Defendant at the time of the traffic stop. Bliss averred that LeClair observed a pistol underneath the front passenger side seat, where the Defendant had previously been seated, and that LeClair had noted in his report of the incident, that the pistol was loaded, and that all of the occupants of the vehicle denied any knowledge, or ownership, of the pistol. Bliss further averred that partial latent fingerprints were visible on the magazine of the pistol, and that DNA evidence can generally be collected from the firearm. Accordingly, the Affidavit requested a DNA Buccal swab, and known major case prints in order to compare the evidence obtained from the firearm, with biological samples from the Defendant.

Beyond the presence of probable cause, we find that the Warrants at issue were sufficiently particularized, as to both the person and materials to be seized, and the

Defendant draws no other infirmity in the Warrant to our attention, and our own independent review fails to disclose any.  Notably, the Defendant contends that the physical evidence was obtained after LeClair had wrongfully detained the Defendant, in violation of the Fourth Amendment.  However, as we have previously detailed, we find no violation of the Fourth Amendment occurred during LeClair's interactions with the Defendant.  Accordingly, we recommend that the Defendant's Motions to Suppress the evidence obtained by Search Warrant, be denied in all respects.

B.     The Defendant's Motion to Suppress any Evidence Obtained as a Result of Any Illegal Interrogations.

       1.     Standard of Review.  Government agents are not required to administer Miranda warnings to everyone whom they question.  See, Oregon v. Mathiason, 429 U.S. 492, 495 (1977).   Rather, Miranda warnings are required for official interrogations where a person has been "'taken into custody or otherwise deprived of his freedom of action in any significant way.'"  Stansbury v. California, 511 U.S. 318, 322 (1994), quoting Miranda v. Arizona, supra at 444;  United States v. Helmel, 769 F.2d 1306, 1320 (8th Cir. 1985); Berkemer v. McCarty, supra at 428-29.

       If a person is subjected to a custodial interrogation, he or she "has the right to consult with an attorney and to have counsel present during questioning."  Davis v. United States, 512 U.S. 452, 457 (1994).  To exercise that right, however, a suspect

"must unambiguously request counsel," which "'requires at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" <u>Id.</u> at 459, quoting <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 178 (1991).   Furthermore, "if a suspect makes a reference to an attorney that is ambiguous or equivocal * * * [such] that the suspect **might** be invoking his right to counsel, our precedents do not require the cessation of questioning." <u>Id.</u> [emphasis in original].

"The right to counsel recognized in Miranda is sufficiently important to suspects in criminal investigations, * * * that it 'requir[es] the special protection of the knowing and intelligent waiver standard.'" <u>Davis v. United States</u>, supra at 458, quoting <u>Edwards v. Arizona</u>, 451 U.S. 477, 483 (1981).   Nevertheless, "[i]f the suspect effectively waives his right to counsel after receiving the Miranda warnings, law enforcement officers are free to question him." <u>Id.</u>, citing <u>North Carolina v. Butler</u>, 441 U.S. 369, 372-376 (1979); see also, <u>United States v. Jones</u>, 23 F.3d 1307, 1313 (8th Cir. 1994).   The burden rests with the Government to prove, by a preponderance of the evidence, that the Defendant knowingly and voluntarily waived his <u>Miranda</u> rights.   See, <u>Colorado v. Connelly</u>, 479 U.S. 157, 168 (1986); <u>United States v. Dougherty</u>, 810 F.2d 763, 773 (8th Cir. 1987).   However, "Miranda has no

application to statements * * * that are voluntarily offered and are not a product of either express questioning or any police practice reasonably likely to evoke an incriminating response." United States v. Griffin, 922 F.2d 1343, 1357 (8th Cir. 1990), citing United States v. McGauley, 786 F.2d 888, 891 (8th Cir. 1986), and United States v. Webster, 769 F.2d 487, 492 (8th Cir. 1985).

Further, the Supreme Court has recognized that, in order for a confession to be admitted into evidence, it must be voluntary if it is to satisfy the Fifth Amendment's right against self-incrimination. See, Dickerson v. United States, 530 U.S. 428, 433-34 (2000). For a confession to be considered voluntary, a Court must examine "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." Dickerson v. United States, supra at 434, citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).

As the Supreme Court has recently explained:

> The due process test takes into consideration "the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation." [Schneckloth v. Bustamonte, 412 U.S. at 226.] See also Haynes [v. Washington, 373 U.S. 503, 513] (1963); Gallegos v. Colorado, [370 U.S. 49, 55] (1962); Reck v. Pate, [367 U.S. 433, 440] (1961) ("[A]ll the circumstances attendant upon the confession must be taken into account"); Malinski v. New York, [324 U.S. 401, 404] (1945)("If all the attendant circumstances indicate that the confession was

- 37 -

> coerced or compelled, it may not be used to convict a
> defendant").   The determination "depend[s] upon a
> weighing of the circumstances of pressure against the
> power of resistance of the person confessing."   Stein v.
> New York, [346 U.S. 156, 185] (1953).

Id. at 434.

Among the circumstances, which are to be considered in this analysis are, first and

foremost, whether a Miranda warning has been given, see, Withrow v. Williams, 507

U.S. 680, 693 (1993); any elements of "police coercion," see, Colorado v. Connelly,

479 U.S. 157, 167 (1986); the length of the interrogation, see, Ashcraft v. Tennessee,

322 U.S. 143, 153-154 (1944); the location of the interrogation, see, Reck v. Pate, 367

U.S. 433, 441 (1961); and the continuous nature of the interrogation, see, Leyra v.

Denno, 347 U.S. 556, 561 (1954).   See also, Withrow v. Williams, supra at 693

(listing the applicable considerations).

     2.   Legal Analysis.   The Defendant has conceded that he was advised of

his Miranda rights, prior to the statements at issue.   However, the Defendant's Motion

is premised on his assertion that his statements were the fruit of Fourth Amendment

violations, which occurred during the traffic stop, as well as violations of the Fifth

Amendment, after he asserted his right to speak with an attorney.   For reasons

previously detailed, we have found no Fourth Amendment violations in either the

traffic stop, or in the additional inquiries as to the Defendant's identity, and we find

no responsible basis to invoke the "fruit of the poisonous tree" doctrine under these circumstances, so as to suppress his statements made to LeClair.

As to the occurrence of any Fifth Amendment violations, we note that the Defendant, in a circuitous exchange with LeClair that is reminiscent of Abbott and Costello's "Who's on First," when asked whether he wanted to speak with an attorney, responded by stating "Yeah -- probably -- cuz you ain't explaining nothin." LeClair responded by attempting to clarify whether the Defendant had invoked his right to speak with counsel.  In response to LeClair's clarifying, albeit compound question, the Defendant stated "No, I just want to get my money and leave." Government Exh. 2, at p. 4.  On this Record, it is not clear to which of LeClair's inquiries the Defendant's "No" related, but it is plain that, if the Defendant were invoking his Miranda rights, his invocation was both ambiguous, and equivocal, which would allow LeClair to seek clarification.

Pursuant to Edwards v. Arizona, supra, in the context of the Fifth Amendment, "[a] suspect who invokes the Miranda right to counsel may not be reapproached by police unless counsel is made available."  United States v. Harris, 221 F.3d 1048, 1051 (8th Cir. 2000).  However, as we have previously noted, in order to successfully invoke a right to counsel, a suspect's request must be unambiguous, and unequivocal.

See, Davis v. United States, supra at 459; McNeil v. Wisconsin, supra at 178.

Furthermore, "if a suspect makes a reference to an attorney that is ambiguous or

equivocal * * * [such] that the suspect **might** be invoking his right to counsel, our

precedents do not require the cessation of questioning." Id. [emphasis in original].

Accordingly, the question presented is whether the Defendant's statement, "Yeah –

probably – cuz you ain't explaining nothin'," constituted an unequivocal invocation

of his right to counsel. We find that it did not.

In order to invoke his right to counsel, a suspect "must articulate his desire to

have counsel present sufficiently clearly that a reasonable officer in the circumstances

would understand the statement to be a request for an attorney." Davis v. United

States, supra at 459. Applying this standard, the United States Court of Appeals for

the Seventh Circuit recently held that the question, "Can I have a lawyer," was an

invocation of the right to counsel. See, United States v. Lee, 413 F.3d 622, 626 (7th

Cir. 2005). Similarly, Courts have held that a statement such as "maybe I should talk

to an attorney by the name of William Evans," see, Abela v. Martin, 380 F.3d 915,

926-27 (6th Cir. 2004), and "I'd just as soon have an attorney," see, Kyer v. Carlton,

146 F.3d 374, 379 (6th Cir. 1998), also constitute unequivocal invocations of the right

to counsel. See also, Alvarez v. Gomez, 185 F.3d 995, 998 (9th Cir. 1998)(finding the

defendant's three questions: "Can I get an attorney right now," "You can have an attorney right now," and "Well, like right now you got one," together constituted an unequivocal invocation); United States v. Johnson, 400 F.3d 187, 195 (4th Cir. 2005) (holding that suspect who checked "no" on a form which asked whether he "want[ed] to make a statement without his lawyer at this time," unequivocally invoked right to counsel ); United States v. Miller, 2005 WL 8475323 at 3 (D. Neb., December 20, 2005)("There is nothing unclear or equivocal about the statement 'I want to talk to my lawyer.'").

On the other hand, the statement "Maybe I should talk to a lawyer," that was presented to the Supreme Court in Davis v. United States, supra at 455, was deemed equivocal, as were the statements "Do you know any good attorneys," see, United States v. Kelly, 329 F.3d 624, 630 (8th Cir. 2003), "I think I would like to talk to a lawyer," Clark v. Murphy, 331 F.3d 1062, 1065 (9th Cir. 2003), and "I think I need a lawyer," Burket v. Angelone, 208 F.3d 172, 198 (9th Cir. 2000). See also, United States v. Syslo, 303 F.3d 860, 867 (8th Cir. 2002)(finding statement "I don't think I need an attorney for this" was equivocal); United States v. Ramirez, 2002 WL 31933026 at *6-8 (S.D. Iowa, April 16, 2002)(holding that the defendant's question to an officer of whether he thought that the defendant needed an attorney was

equivocal); United States v. Segal, 207 F. Supp.2d 835, 841 (N.D. Ill. 2002)(holding that the defendant did not invoke his right to counsel, when he told the officers "you can talk to my lawyer"); Williams v. Larson, 2003 WL 1785807 (N.D. Cal., March 31, 2003)(holding that the defendant's statement, that he had talked to counsel who had told him not to talk, was not an invocation of the right to counsel); United States v. Sprouse II, 2002 WL 15866 (W.D. Va., January 8, 2002)(same); cf., Bruni v. Lewis, 847 F.2d 561, 564 (9th Cir. 1988)(holding that the defendant did not unambiguously invoke his right to counsel when he stated, in response to an officer's request that he answer questions, "[n]ot without my attorney," and then immediately added, "[w]ell, ask your questions and I will answer those I see fit").

In the context of a Habeas Petition, our Court of Appeals was recently presented with the question of whether a State Court's finding, that the statement, "Could I call my lawyer," was equivocal, constituted an unreasonable application of clearly established Federal law.   See, Dormire v. Wilkinson, 249 F.3d 801, 805 (8th Cir. 2001), cert. denied, 534 U.S. 962 (2001).   In its analysis, the Court noted that the State Court's conclusion was premised upon the principle announced in Davis, and the State Court had concluded that the Petitioner did not request the assistance of counsel, but only requested to call his attorney.   The Court also noted that, since the interviewing

officer had answered "yes" to the petitioner's question of whether he could call his lawyer, the State Court had found that the petitioner "was given the opportunity [to call an attorney], and for reasons only known to him, declined to do so." Id. at 803-04. Based on these findings, the Court held that the State Court's conclusion, that the petitioner's statement was equivocal, did not constitute an unreasonable application of clearly established Federal law -- reversing the holding of the District Court to the contrary. Id. at 805 ("[Petitioner's] question was not such a clear and unambiguous request for counsel that [the investigating officer] was required to stop his interrogation."); see also, United States v. Eastman, 256 F. Supp.2d 1012, 1019 n. 6 (D. S.D. 2003)(finding, in dicta, that the question, "Can I have a lawyer" "[w]as not an unequivocal request for counsel within the meaning of Davis and its progeny"), citing 2 W. LeFave, J. Israel, N. King, Criminal Procedure, §6.9(g) at pp. 609-112, n. 148; but see, United States v. Lee, supra at 626 (statement, "Can I have my lawyer" was proper invocation of Miranda).

Here, the response provided by the Defendant, "Yeah -- probably -- cuz you ain't explaining nothin'" was equivocal in the sense that it was reasonable for LeClair to conclude that the Defendant might be interested in speaking with an attorney, but that the Defendant was willing to proceed with the interview if LeClair provided

additional information.   Given that the Defendant qualified his response with the term

"probably," and that he noted his displeasure with the lack of information that LeClair

has supplied to that point, we find that the Defendant's statement was not an

unequivocal and unambiguous request to speak with counsel.

Moreover, we are mindful that, in <u>Davis</u>, the Supreme Court did not require the

interviewing officers to ask clarifying questions following an equivocal invocation of

counsel, but certainly did not prohibit such a limited inquiry.   As the Court explained:

> Of course, when a suspect makes an ambiguous or
> equivocal statement it will often be good police practice for
> the interviewing officers to clarify whether or not he
> actually wants an attorney. * * * Clarifying questions help
> protect the rights of the suspect by ensuring that he gets an
> attorney if he wants one, and will minimize the chance of
> a confession being suppressed due to subsequent judicial
> second-guessing as to the meaning of the suspect's
> statement regarding counsel.   But we decline to adopt a rule
> requiring officers to ask clarifying questions.

<u>Id.</u> at 461-62.

Here, LeClair asked clarifying questions, albeit in a compound format, after the

Defendant responded to LeClair's question concerning whether the Defendant wished

to speak to a lawyer.   Notably, LeClair further inquired as to whether the Defendant

wanted to talk to a lawyer, or if he wanted to have LeClair explain the situation to

him.   To this inquiry, the Defendant responded by saying "no," and that he wanted to

obtain the funds necessary for him to be released.  In sum, we are unable to find that "a reasonable officer in light of the circumstances would have understood" the Defendant's statement as an unequivocal request to confer with counsel.  <u>Davis v. United States</u>, supra at 459.  Indeed, when directly questioned as to whether he wanted to speak with his attorney, the Defendant never responded with an unqualified "yes," or "no," as LeClair had requested.  See, <u>Government Exh. 2</u>, at p. 3.

To the extent that it might be urged that the Seventh Circuit's reasoning, in <u>United States v. Lee</u>, supra, would reach a different conclusion, we disagree.  There, after concluding that the statement "Can I have a lawyer?," was a proper invocation of the defendant's right to counsel, the Court went on to add:  "Therefore, unless the police obtained further clarification from Lee that this was actually an unequivocal request for an attorney, they should have halted the interrogation."  <u>United States v. Lee</u>, supra at 626.  We construe this statement as reflecting the Court's conclusion that, while the comment of the defendant, there, properly invoked a right to counsel, it remained sufficiently ambiguous, because an unequivocal invocation of <u>Miranda</u> would have precluded further questioning of that defendant.  However, there, the Court encouraged further questioning, reasoning as follows:

> Before proceeding with the analysis, we remind police
> officers of the instruction the Supreme Court offered in

- 45 -

> Davis.  "[w]hen [sic] a suspect makes an ambiguous or
> equivocal statement it will often be good police practice for
> the interviewing officers to clarify whether or not he
> actually wants an attorney."  512 U.S. at 461, 114 S.Ct.
> 2350.  By affirmatively establishing whether a suspect
> invoked counsel, police (and reviewing courts) can know
> precisely where they stand.  We highly encourage police to
> follow the advice offered by the Supreme Court and take
> the time to clarify such issues at the time of interrogation
> rather than in after-the fact arguments before the courts.

Id. at 626-27.

In Lee, the police did not ask the defendant any clarifying questions, as LeClair did

here, but engaged in conduct that was, to the Court there, a "matter of some concern."

Id. at 627.  Ultimately, the Court determined that any misstep in the questioning of the

defendant was harmless error.   Id.   Accordingly, we find Lee to be somewhat

enigmatic but, to the extent that the Court appears to have encouraged clarifying

questions to the interviewing officers there, we find that encouragement consistent

with the practice followed by LeClair.

Accordingly, we find that the Defendant's Fifth Amendment rights were not

violated by LeClair's continued interview with the Defendant, after the Defendant's

ambiguous responses to LeClair's questions regarding whether the Defendant wished

to speak with an attorney.

We also find that the Defendant's statements were voluntary, and without inducement by either threats or promises.  LeClair did not use subterfuge, or coercive tactics, but explained to the Defendant why he wished to speak to the Defendant, and further advised him of his rights.  Having been so informed, the Defendant continued to inquire as to why he was being held.  It is also noteworthy that the Defendant responded appropriately  to LeClair's questions, and never expressly asked for the questioning to stop, or unequivocally requested that he be permitted to consult an attorney before answering any specific question.  Moreover, the Defendant was previously familiar with law enforcement procedure, as he had thirteen (13) prior felony convictions, and would certainly be aware of his ability to terminate the interview, or expressly request to speak with an attorney, if that were his intent.

Therefore, under the totality of the circumstances, we recommend that the Defendant's Motion to Suppress the Statements, and any other evidence resulting from LeClair's interrogation,  be denied.

NOW, THEREFORE, It is --

RECOMMENDED:

1.      That the Defendant's Motion to Suppress Evidence Obtained as a Result of any Illegal Searches or Seizures [Docket No. 14] be denied.

2.      That the Defendant's Motion to Suppress any Evidence Obtained as a Result of Any Illegal Interrogations [Docket No. 15] be denied.

Dated: November 17, 2006                    s/Raymond L. Erickson

                                            Raymond L. Erickson
                                            CHIEF U.S. MAGISTRATE JUDGE

## NOTICE

Pursuant to Rule 45(a), Federal Rules of Criminal Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than December 5, 2006**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than December 5, 2006**, unless all interested

- 48 -

parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.